UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

In re                                                                    Bank. No. 304-31605-elp11

Oregon Arena Corporation,                                Civil No. 05-857-HA

        Debtor.                                              OPINION AND ORDER
_____

HAGGERTY, Chief Judge:

      The matter before the court is an appeal from an Order of the United States Bankruptcy Court for the District of Oregon holding that several agreements entered into between the City of Portland (Portland) and Oregon Arena Corporation (OAC or Debtor) constituted a single, indivisible contract (the Order). Portland had filed a Motion seeking the Order, and the Bankruptcy Court granted the Motion and entered the Order on October 29, 2004. OAC and certain creditors (the Noteholders) appealed the Order on February 8, 2005.

      This court serves as an appeals court from decisions of the bankruptcy court. This court exercises jurisdiction under 28 U.S.C. § 158(a)(1). For the reasons below, this court affirms the United States Bankruptcy Court's ruling in its entirety.

1  -  OPINION AND ORDER

**BACKGROUND**

In 1992, the City and OAC entered into several agreements addressing the development and operation of Rose Garden Arena (the Arena) and related properties. The agreements were: the Development Agreement; the Coliseum Operating Agreement; the Arena Ground Lease; the Entertainment Complex Ground Lease; the Plaza Lease (terminated prior to the bankruptcy proceedings); a Declaration of Covenants, Conditions and Restrictions; and a Public Parking Agreement (collectively "the Agreements").

Construction of the Arena, the Entertainment Complex, and the parking structures was financed through notes in the original principal amount of $155,000,000.00 (the Notes). The Prudential Insurance Company of America became the lead noteholder and collateral agent (the Collateral Agent) on behalf of the Noteholders. Under a Security Agreement dated June 23, 1993, the Debtor assigned to the Collateral Agent certain of the Agreements as part of the collateral. Included as part of this assignment were the Arena Lease and the Development Agreement.

On February 27, 2004, OAC filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the Bankruptcy Code). OAC filed a plan of reorganization that provided for the rejection of the Coliseum Operating Agreement, and the assumption and assignment of the other agreements. The Coliseum Operating Agreement requires OAC to provide for the operation of the Memorial Coliseum, and to cover any losses arising from its operation. Those losses have been significant.

On April 26, 2004, the City filed a Motion seeking an order determining that the Agreements constitute a single, indivisible contract between the parties that must be assumed, or assumed and assigned, as a single contract for the purposes of section 365 of the

Bankruptcy Code, which establishes that an executory contract must be accepted or rejected in its entirety.  The Debtor argued that the Agreements constitute separate and severable contracts for purposes of section 365 of the Bankruptcy Code.

On September 15, 2004, the Bankruptcy Court announced on the record its decision granting the City's Motion.  The Order holding that the Agreements are a single, indivisible contract issued on October 29, 2004.

The Noteholders formed an acquisition entity, Portland Arena Management, LLC (PAM).  On November 8, 2004, the Debtor and PAM filed an appeal of the Order.

## STANDARDS

The district court reviews the findings of fact of the bankruptcy court under a clearly erroneous standard, and conclusions of law are reviewed *de novo*.  *In Re Cellular 101, Inc.*, 377 F.3d 1092, 1095 (9th Cir. 2004).

Under the Bankruptcy Code, an executory contract must be accepted or rejected in its entirety unless it is severable.  *In Re Rovine Corp.*, 6 B.R. 661, 666 (Bankr. Tenn. 1980) (an executory contract must be rejected in its entirety); *In Re Stanton*, 248 B.R. 823, 830 (9th Cir. B.A.P. 2000) (citing *In Re Pacific Express, Inc.*, 780 F.2d 1482, 1486 (9th Cir 1986)) (if the agreement can be disaggregated then each must be considered separately for purposes of section 365).

Whether multiple obligations in an agreement are severable is a question of state law. *In Re Pollack*, 139 B.R. 938, 940 (9th Cir. B.A.P. 1992).  In Oregon, whether a contract is divisible is derived from the intention of the parties.  *ICN Med. Labs., Inc. Employees Profit Sharing Fund v. ICN Med. Labs., Inc.*, 682 F.2d 1326, 1330 (9th Cir. 1982) (citing *Pettigrove v. Corvallis Lumber Mfg. Co.,* 21 P.2d 198, 199 (Or. 1933)).  "This intention is deduced from

3 -  OPINION AND ORDER

the language used and the surrounding circumstances."  *ICN Med. Labs.*, 682 F.2d at 1330; *see also Care Med. Equip., Inc. v. Baldwin*, 15 P.3d 561, 563 (Or. 2000).

Under Oregon law, when "parties contemporaneously execute multiple agreements that address interrelated subjects, we are bound to construe them together as one contract to discern the parties' intent."  *Snow Mountain Pine, Ltd. v. Tecton Laminates Corp.*, 869 P.2d 369, 372 (Or. App. 1994); *see also Oregon-Pac. Forest Prod. Corp. v. Welsh Panel Co.*, 248 F. Supp. 903, 907 (D. Or. 1965) (multiple agreements executed contemporaneously by the same parties in reference to the same subject matter constitutes one contract); *Hays v. Hug,* 412 P.2d 373, 374 (Or. 1966) (*en banc*) (same); *Lowe v. Harmon*, 115 P.2d 297, 301 (Or. 1941) (same).

## ANALYSIS

Appellant PAM objects to the finding of the Bankruptcy Court that the Agreements constitute a single, indivisible contract under section 365 of the Bankruptcy Code.  PAM asserts that the Agreements are discrete instruments with separate consideration.  Whether the Agreements are integrated or divisible is an issue of law, and is reviewed *de novo*.

PAM asserts that the Agreements do not constitute a single integrated contract.  This argument is unavailing.  Integration is a matter of the parties' intent.  An integrated agreement is "one that the parties intended to be a final expression" of the terms of the agreement. *Ambercrombie v. Hayden Corp.*, 883 P.2d 845, 850 (Or. 1994).  In determining whether a writing was meant to be an integration, a court looks to the writing itself because "the apparent completeness and detail of the writing itself may lead the court to conclude the parties intended the writing to be a complete integration of their agreement."  *Hatley v. Stafford*, 588 P.2d 603, 608 (Or. 1978).  Here, the Agreements, taken as a whole, represent a

highly detailed and complex agreement regarding the construction and development of the Rose Quarter complex. The Development Agreement also contained an integration clause, establishing that it and the Related Agreements constitute the entire agreement between the parties.

Moreover, the Agreements were executed contemporaneously, encompass the same subject matter, include extensive cross references to one another, and include cross-default provisions. Execution of all the related agreements was a condition precedent to the closing of the Development Agreement. These factors indicate the parties intended the Agreements to be construed as one integrated contract. *See Snow Mountain Pine, Ltd.*, 869 P.2d at 372; *Oregon-Pac. Forest Prod. Corp.,* 248 F. Supp. at 907; *Hays v. Hug,* 412 P.2d at 374; *Lowe,* 115 P.2d at 301. The Bankruptcy Court correctly construed the Agreements as one integrated contract.

PAM also contends that even if the Agreements are one integrated contract, they are severable. PAM argues that the Bankruptcy Court erroneously conflated the analysis of integration with the evaluation of severability. This argument misstates the analysis of the Bankruptcy Court. After discussing the issue of integration, the Bankruptcy Court specifically addressed the separate issue of severability. The Bankruptcy Court found that the Coliseum Agreement could not be disaggregated for purposes of applying section 365.

Whether a contract is divisible is also a question of the intent of the parties. *See ICN Med. Labs., Inc.*, 682 F.2d at 1330; *Care Med. Equip.*, 15 P.3d at 563. Appellant argues that the factors to be considered in determining the intent of the parties regarding severability are (1) whether the nature and purpose of the obligations under the Agreements differ; (2) whether the consideration for the obligations under the Agreements are separate and distinct;

5 - OPINION AND ORDER

and (3) whether obligations of the parties under the Agreements are interrelated. The test proposed by Appellants is from a Ninth Circuit Court of Appeals case applying California Law. *In Re Pollack*, 139 B.R. at 940-41. In Oregon, courts interpret the intention of the parties by looking to the language of the agreement and other relevant circumstances. *ICN Med. Labs., Inc.*, 682 F.2d at 1330; *Care Med. Equip.,* 15 P.3d at 563. Many of the factors considered in determining that the Agreements constituted an integrated contract are also important in determining whether that contract is divisible.

The Development Agreement describes the background of the Agreements and their interrelation. It notes that OAC will construct a new arena, an attached parking garage, and the Entertainment Complex; will operate or lease the Memorial Coliseum; will operate the parking garages; that the City will lease the property to OAC; and that the parties entered into the Development Agreement and the Related Agreements for valuable consideration. Execution of the Related Agreements was an express condition to the closing of the Development Agreement.

An essential inquiry in determining the intent of the parties regarding divisibility is whether there was single assent to a whole transaction involving several kinds of property, or a separate assent to each of the things involved. *See United States v. Bethlehem Steel Corp.*, 315 U.S. 289, 298 (1942); *In the Matter of T & H Diner, Inc.*, 108 B.R. 448, 454 (Bankr. D. N. J. 1989). Here, there was a single assent to the entire transaction. The execution of all the Agreements was required prior to the deal taking effect.

PAM argues that the Coliseum is located on a separate piece of property from the other properties involved in the Agreements, and that this fact supports severability.

Although it is true the Coliseum is on a separate piece of property, the two properties are connected.

PAM also argues that the obligations undertaken within the Agreements relating to the Coliseum are separate from the obligations undertaken in the Agreements relating to the other properties. To the contrary, the conditions required by the Agreements establish that the parties intended the obligations undertaken to be connected. The Coliseum Operating Agreement requires the operator of the Coliseum to be the same as the lessee under the Arena Lease. The Coliseum Operating Agreement and the Arena Lease both provide for comprehensive coordination and integration in the operation and management of the Coliseum and the Arena. The Arena Lease requires the tenant to coordinate equipment use and event booking with the Coliseum. The Coliseum Agreement requires OAC to provide staff for joint scheduling, marketing and promotion of the Arena and the Coliseum, and that for certain events the staff must attempt to persuade the client to use the Coliseum instead of the Arena. The Coliseum Operating Agreement also establishes extensive participation by OAC in increasing the attractiveness of the Coliseum for conferences, conventions, trade shows, and other affordable entertainment. It emphasizes that the coordination between the Coliseum and the Arena is designed to promote the profitability of the Coliseum, and prohibits OAC from entering into any arrangement that confer a materially disproportionate benefit on the Arena or impose a materially disproportionate burden on the Coliseum.

As demonstrated by the language of the Agreements, the intent of the parties was to integrate the operation and management of the Coliseum and Arena to maintain the commercial viability of the Coliseum. If the parties intended the Coliseum Operating Agreement to be a separate contract, the protection offered by the joint obligations would be

7 - OPINION AND ORDER

lost. If the Arena were operated by a separate entity competing with the Coliseum, the Coliseum would lose any chance of commercial viability.

PAM argues that the fact that the City retained the right to demolish the Coliseum indicates that it is a discrete facility with a divisible contract. This court disagrees. The ability of the City to demolish the Coliseum does not indicate the Agreements are severable, but is merely a permissible act under the contract that the parties expressly allowed. In the event of such demolition, the parties intended the remainder of the integrated contract to continue, including the exclusive development rights on the Coliseum property that are granted to OAC in the Development Agreement.

The Development Agreement also establishes the ongoing consideration paid by OAC to the City of user fees for the Arena Lease, the Coliseum Operating Agreement, and the Plaza Lease. The individual property agreements do not include the payment terms of user fees, but merely reference the Development Agreement. If the Coliseum Operating Agreement were construed independently, its ongoing consideration would be lost because it contains no payment terms for user fees. The fact that the Coliseum Operating Agreement lacks such payment terms indicates that the parties did not intend for it to be independent.

The Agreements contain several cross-default provisions. Though not dispositive on the issue of severability, cross-default provisions provide additional evidence of the parties' intent. Termination of the Development Agreement is a default under the Arena Lease and Plaza Lease. A failure by OAC to pay user fees is a default under the Development Agreement, and also the Coliseum Operating Agreement, Arena Lease, and Plaza Lease. A breach by the City under the Development Agreement, Area Lease, Plaza Lease, or Entertainment Complex Lease is also a default under the Coliseum Operating Agreement.

8 - OPINION AND ORDER

Additionally, breach of the Arena Lease or Plaza Lease constitutes a breach of the Coliseum Operating Agreement and the Public Parking Agreement.

PAM argues that the rights of the Noteholders to foreclose separately on the Arena Lease and the Entertainment Complex Lease in the event of a default by OAC under the Note Agreement evidence the severability of the Agreements.

The clauses protecting the investment of the Noteholder's are a business reality, but do not indicate the parties intended the Agreements to be severable.  The Arena and Entertainment Complex were privately financed.  This financing was contingent upon the Noteholders being able to foreclose on the property they financed.  Options to foreclose on the Coliseum were omitted because that property was not privately financed.  Even if those clauses could be viewed as some evidence of an intent that the Agreements be construed independently, such evidence is outweighed by numerous other clauses establishing that the parties' intended that the Agreements represent one, indivisible contract.

## **CONCLUSION**

For the reasons provided, the appeal is denied.  This court ADOPTS the decision of the United States Bankruptcy Judge.  This court finds no clear error regarding the Bankruptcy Court's factual findings and the conclusions of law withstand a *de novo* review.

IT IS SO ORDERED.

DATED this _28____ day of February, 2006.

_____/s/Ancer L.Haggerty_____
Ancer L. Haggerty
United States District Judge